Luke A. Wake, Cal. Bar No. 264647*
Damien M. Schiff, Cal. Bar No. 235101*
Jeffrey W. McCoy, Cal. Bar No. 317377*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
LWake@pacificlegal.org
DSchiff@pacificlegal.org
JMcCoy@pacificlegal.org
CYates@pacificlegal.org
*Pro Hac Vice

Attorneys for Plaintiffs
Inside Passage Electric Cooperative
and Alaska Power Association

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>    Defendants,<br><br>ORGANIZED VILLAGE OF KAKE, *et al.*,<br><br>    Intervenor-Defendants. | Case No. 3:23-cv-00203-SLG<br><br>CONSOLIDATED<br><br>LEAD CASE |
| INSIDE PASSAGE ELECTRIC COOPERATIVE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. DEPARTMENT OF AGRICULTURE, *et al.*,<br><br>    Defendants, | Case No. 3:23-cv-00204-SLG<br><br>CONSOLIDATED |

|                                                      |                              |
|------------------------------------------------------|------------------------------|
| ORGANIZED VILLAGE OF KAKE, *et al.*,                 |                              |
|          Intervenor-Defendants. | |
| GOVERNOR FRANK MURKOWSKI, *et al.*,                  | Case No. 1:23-cv-00010-SLG   |
|          Plaintiffs, | CONSOLIDATED |
|     v.                            |                              |
| TOM VILSACK, *et al.*,                               |                              |
|          Defendants, |                  |
| ORGANIZED VILLAGE OF KAKE, *et al.*,                 |                              |
|          Intervenor-Defendants. | |

## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT BY <u>PLAINTIFFS INSIDE PASSAGE ELECTRIC COOPERATIVE, *et al.*</u>
### (ORAL ARGUMENT REQUESTED)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

MOTION FOR SUMMARY JUDGMENT ........................................................ 1

INTRODUCTION ................................................................................................ 1

BACKGROUND AND STATEMENT OF FACTS ........................................... 2

    I.    USDA Imposes Roadless Rule Restrictions on 58.5 Million Acres ....................... 2

          A.    USDA Withdraws Roadless Rule Restrictions in the Tongass .......... 4

          B.    USDA Restores Full Roadless Rule Restrictions .............................. 5

          C.    The Roadless Rule Inhibits Prospective Energy Projects ................. 6

                  1.    The Roadless Rule Blocks the Kake-Petersburg Intertie Project ................................................................... 6

                  2.    The Roadless Rule Inhibits Other Projects ............................ 7

    II.    USDA's Claimed Statutory Authority for the Roadless Rule ................ 8

STANDARD OF REVIEW ................................................................................... 9

SUMMARY OF ARGUMENT ............................................................................ 10

ARGUMENT ........................................................................................................ 12

    I.    The Secretary Has No Authority to Impose Roadless Rule Restrictions .............. 12

          A.    The Major Questions Doctrine Forecloses the Secretary's Claim to a Long Unheralded Power to Deny Nearly All Practical Public Access to and Use of Vast Swaths of National Forestlands ........... 13

          B.    The Organic Act and MUSYA Clearly Prohibit the Roadless Rule ................................................................................... 19

                  1.    The Organic Act Does Not Authorize Sweeping Roadless Rule Restrictions Over Vast Swaths of National Forestlands ............................................................. 20

                          a.    The Text Unambiguously Forecloses the Roadless Rule ........................................................... 20

b.    The Secretary's Interpretation Unreasonably Transforms the Authority to Prohibit "Destruction" of Forestlands into an Ungoverned and Limitless Power .............................. 22

2.    The Multiple Use Sustained Yield Act Does Not Authorize Roadless Restrictions Bluntly Denying Practical Use and Access ..................................................... 24

a.    The Multiple Use and Sustained Yield Mandate Likewise Forecloses the Roadless Rule .................... 24

b.    Any Interpretation Conferring Unchecked Authority to Preclude Reasonable Access and Use Is Unreasonable ........................................... 25

II.   No Intelligible Principle Governs the Secretary's Rulemaking Authority ........... 27

A.    The Nondelegation Doctrine Requires Congress Must Provide a Standard to Limit and Channel the Exercise of Discretion ........... 27

B.    Congress Violated the Nondelegation Doctrine in Delegating Unfettered Rulemaking Authority to the Secretary ........................ 29

1.    There Is No Intelligible Principle Under the Secretary's Interpretation of the Organic Act ...................... 29

2.    The Charge to Manage Lands for "Multiple Use and Sustained Yield" Is Not an Intelligible Principle ................. 32

III.   The Energy Providers Have Article III Standing .................................................. 34

CONCLUSION ........................................................................................................ 35

CERTIFICATE OF SERVICE ........................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) .................................................................................28-29, 32

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ................................................................... 3

*Central Pac. Ry. Co. v. Alameda Cnty.*,
  284 U.S. 463 (1932) ................................................................................ 16

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ................................................................................ 19

*Citizens to Preserve Overton Park v. Volpe*,
  401 U.S. 402 (1971) ................................................................................ 9

*Crowell v. Benson*,
  285 U.S. 22 (1932) .................................................................... 24, 26, 32

*Diaz-Rodriguez v. Garland*,
  55 F.4th 697 (9th Cir. 2022) ..............................................................20-21

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ......................................................................... 15, 22

*FEC v. Cruz*,
  596 U.S. 289 (2022) ................................................................................ 12

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ................................................................................ 9

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................................ 35

*Frlekin v. Apple, Inc.*,
  979 F.3d 639 (9th Cir. 2020) ................................................................ 9

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................................................ 14

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ............................................................................ 27

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987) ................................................................................ 21

*Int'l Union v. OSHA*,
    37 F.3d 665 (D.C. Cir. 1994) ................................................................. 31

*Int'l Union v. OSHA*,
    938 F.2d 1310 (D.C. Cir. 1991) ............................................................. 34

*J.W. Hampton, Jr., & Co. v. United States*,
    276 U.S. 394 (1928) ............................................................................. 27

*Lagandaon v. Ashcroft*,
    383 F.3d 983 (9th Cir. 2004) ............................................................... 21

*Loper Bright Enterprises v. Raimondo*,
    143 S. Ct. 2429 (2023) ......................................................................... 19

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ...................................................................... 12, 19

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 34

*Marvin M. Brandt Revocable Tr. v. United States*,
    572 U.S. 93 (2014) ............................................................................... 16

*Mayes v. Biden*,
    67 F.4th 921 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023) ................... 13

*MCI Telecomms. Corp. v. AT & T Co.*,
    512 U.S. 218 (1994) ............................................................................. 21

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
    595 U.S. 109 (2022) ............................................................................. 27

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................................. 28

*Nebraska v. Biden*,
    143 S. Ct. 2355 (2023) ......................................................................... 16

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ............................................................ 3-4

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ................................................................. 27-29, 33

*Perkins v. Bergland*,
    608 F.2d 803 (9th Cir. 1979) ........................................................ 25, 32

*Perrin v. United States*,
    444 U.S. 37 (1979)................................................................. 22

*Rodriguez v. United States*,
    480 U.S. 522 (1987)............................................................... 28

*Ross v. United States*,
    29 Ct. Cl. 176 (1894) ........................................................... 21

*Sackett v. EPA*,
    598 U.S. 651 (2023)............................................................... 14

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
    819 F. Supp. 2d 1077 (E.D. Cal. 2011)........................................ 9

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018) .......................................................... 19

*Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)............................................................... 26

*Strickland v. Morton*,
    519 F.2d 467 (9th Cir. 1975) ................................................. 32

*The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*,
    353 F.3d 1051 (9th Cir. 2003) ............................................... 22

*Town of Chester v. Laroe Ests., Inc.*,
    581 U.S. 433 (2017)............................................................... 35

*United States v. Eaton*,
    144 U.S. 677 (1892)............................................................... 30

*United States v. Grimaud*,
    220 U.S. 506 (1911)..........................................................*passim*

*United States v. Pheasant*,
    No. 3:21-CR-00024, 2023 WL 3095959 (D. Nev. Apr. 26, 2023)........................31-33

*United States v. United Verde Copper Co.*,
    196 U.S. 207 (1905)............................................................... 28

*United States v. Weiss*,
    642 F.2d 296 (9th Cir. 1981) ................................................. 20

*Utility Air Regulatory Group v. EPA*,
    573 U.S. 302 (2014)............................................................... 15

*State of Alaska v. USDA*           v
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 7 of 47

*W. Watersheds Project v. U.S. Forest Serv.*,
  No. CV-11-08128-PCT-NVW, 2012 WL 6589349 (D. Ariz. Dec. 17, 2012),
  *aff'd*, 603 F. App'x 612 (9th Cir. 2015) ........................................................... 9

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ............................................................................................ 14

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825) ............................................................................ 28

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ............................................................ 13-15, 18-19, 27

*Whitman v. Am. Trucking Associations*,
  531 U.S. 457 (2001) ..................................................................................... 23, 27

*Wyoming v. U.S. Dep't of Agric.*,
  570 F. Supp. 2d 1309 (D. Wyo. 2008) ........................................................ 2-3

*Wyoming v. U.S. Dep't of Agric.*,
  661 F.3d 1209 (10th Cir. 2011) ...................................................................... 2, 34

*Yith v. Nielsen*,
  881 F.3d 1155 (9th Cir. 2018) .............................................................................. 22

## U.S. Constitution

U.S. Const. art. I, § 1 ...................................................................................................... 27

U.S. Const. art. IV, § 3 ......................................................................................... 10, 16

## Statutes

5 U.S.C. § 706 ................................................................................................................... 9

5 U.S.C. § 706(2) .......................................................................................................... 34

5 U.S.C. § 706(2)(A) ...................................................................................................... 9

5 U.S.C. § 706(2)(B) ...................................................................................................... 9

5 U.S.C. § 706(2)(C) ...................................................................................................... 9

16 U.S.C. § 472 ................................................................................................................ 8

16 U.S.C. §§ 473-482 ..................................................................................................... 8

16 U.S.C. § 475 ......................................................................................................... 8, 21

*State of Alaska v. USDA*                                    vi
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 8 of 47

16 U.S.C. § 478 ..................................................................................................... 8, 21-22

16 U.S.C. § 528 ........................................................................................................ 13, 24

16 U.S.C. §§ 528–531 ................................................................................................ 8, 24

16 U.S.C. § 529 .......................................................................................................... 9, 24

16 U.S.C. § 531(a) ........................................................................................... 9, 25-26, 33

16 U.S.C. § 531(b) ..................................................................................................... 24-25

16 U.S.C. § 539d(a) ......................................................................................................... 18

16 U.S.C. § 551 .................................................................................................... 8, 13, 20

16 U.S.C. §§ 1131–1136 ................................................................................................. 17

16 U.S.C. § 3101 ............................................................................................................. 17

16 U.S.C. § 3161 ......................................................................................................... 17-18

16 U.S.C. § 3164 ............................................................................................................. 18

16 U.S.C. § 3167 ............................................................................................................. 18

16 U.S.C. § 3213 ...................................................................................................... 15, 18

28 U.S.C. § 2201 ............................................................................................................. 10

30 U.S.C. § 21a ........................................................................................................... 16-17

30 U.S.C. § 22 ................................................................................................................ 17

54 U.S.C. § 320301 ......................................................................................................... 17

Pub. Law No. 96-487 (Dec. 2, 1980) ............................................................................. 17

## Regulations

36 C.F.R. § 294.12(a) ........................................................................................................ 3

36 C.F.R. § 294.12(b) ........................................................................................................ 3

36 C.F.R. § 294.12(b)(1)-(3) ............................................................................................. 3

36 C.F.R. § 294.12(b)(6) .................................................................................................... 3

36 C.F.R. § 294.12(b)(7) .................................................................................................... 3

# Rules

Fed. R. Civ. P. 56 ................................................................................................ 1

Fed. R. Civ. P. 56(a) ........................................................................................... 9

Civ. L.R. 7.1 ....................................................................................................... 1

# Other Authorities

By the Numbers, U.S. Department of Agriculture, Forest Service,
   https://www.fs.usda.gov/about-agency/newsroom/by-the-numbers ........................... 10

*depredation*, Merriam-Webster Dictionary,
   https://www.merriam-
   webster.com/dictionary/depredate#:~:text=%3A%20to%20l
   ay%20waste%20%3A%20plunder%2C,%CB%8Cde%2Dpr
   %C9%99%2D%CB%88d%C4%81%2Dsh%C9%99n ............................................. 21

*destroy*, Black's Law Dictionary (4th ed. 1968) ................................................ 21

*destruction*, Black's Law Dictionary (4th ed. 1968) ......................................... 20

E.O. 13990, Protecting Public Health and the Environment and Restoring
   Science to Tackle the Climate Crisis, The White House (Jan. 20, 2021),
   https://rb.gy/shmxfs ................................................................................... 5, 15

Fact Sheet: List of Agency Actions for Review, The White House (Jan. 20, 2021),
   https://www.whitehouse.gov/briefing-room/statements-
   releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ ............................. 5

Google's Conversion Tool, https://rb.gy/dwadda ........................................... 10

Letter from Secretary of Agriculture, James Wilson, to Gifford Pinchot,
   Chief Forester of the Bureau of Forestry (Feb. 1, 1905),
   https://foresthistory.org/wp-content/uploads/2017/02/Wilson_letter.pdf .............. 13-14

Special Areas; Roadless Area Conservation,
   66 Fed. Reg. 3244 (Jan. 12, 2001) ............................................................. 1-3

Special Areas; Roadless Area Conservation;
   Applicability to the Tongass National Forest, Alaska,
   68 Fed. Reg. 75,136 (Dec. 30, 2003) ............................................................. 4

Special Areas; Roadless Area Conservation;
   National Forest System Lands in Alaska,
   85 Fed. Reg. 68,688 (Oct. 29, 2020) ........................................................... 3-5

Special Areas; Roadless Area Conservation;
   National Forest System Lands in Alaska,
   88 Fed. Reg. 5252 (Jan. 27, 2023) ........................................................................*passim*

Special Areas; State Petitions for Inventoried Roadless Area Management Rule,
   70 Fed. Reg. 25,654 (May 13, 2005) ................................................................ 3, 13, 23

U.S. Census Bureau, State Area Measurements
   and Internal Point Coordinates (2010),
   https://www.census.gov/geographies/referen
   ce-files/2010/geo/state-area.html ....................................................................10-11, 15

*vast*, Merriam Webster, https://www.merriam-
   webster.com/dictionary/vastness ................................................................................. 15

*State of Alaska v. USDA*        ix
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 11 of 47

# MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, and Civ. L.R. 7.1, Plaintiffs Inside Passage Electric Cooperative and the Alaska Power Association (collectively the "Energy Providers"), hereby move for summary judgment as to all Claims in their Complaint.

# INTRODUCTION

The Inside Passage Electric Cooperative ("Cooperative") is a nonprofit consumer-owned electric utility that seeks to provide affordable and dependable utility services to the dispersed indigenous communities of Hoonah, Kake, Chilkat Valley, Angoon, and Klukwan. Unfortunately, these communities are currently paying some of the highest electricity rates in Alaska. *See* Doc. 1-1, Exhibit A to Complaint, Declaration of Jodi Mitchell ¶¶ 3-4 (Apr. 6, 2023) ("Mitchell Decl."). For comparison, utility rates in the Cooperative's coverage area are nearly ***six times*** rates in Juneau. *Id.* ¶ 5 ("[I]n 2022 the average cost/kWh for Juneau was 12¢ whereas IPEC's average cost/kWh was 65¢"). That is so because the Cooperative is heavily dependent on diesel oil. *Id.* ¶¶ 7-8. Yet there are abundant opportunities to improve the Cooperative's energy infrastructure and to stabilize utility rates—if only the Cooperative could pursue sustainable hydroelectric and geothermal projects within the Tongass National Forest which envelops these communities. But the U.S. Department of Agriculture ("Department") forecloses these desirable projects because the Secretary of Agriculture has imposed a heavy-handed ban on road construction on ***58 million acres across the United States***. *See* Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244 (Jan. 12, 2001) ("Roadless Rule"); Special

Areas; Roadless Area Conservation; National Forest System Lands in Alaska, 88 Fed. Reg. 5252 (Jan. 27, 2023) ("Final Rule").

Without roads it is cost prohibitive for the Cooperative to pursue these projects. The Department's "Roadless Rule" has already killed one of the Cooperative's utility infrastructure projects, and it now inhibits the Cooperative from investing in other projects that promise to reduce utility costs and to immeasurably improve the lives of the people it serves. Likewise, the Roadless Rule stands as a formidable obstacle for members of the Alaska Power Association ("Association") that wish to pursue energy projects in the region. For these reasons, the Energy Providers seek an order setting aside the Final Rule, and a declaration that the Secretary had no authority to impose a rule prohibiting road construction across vast swaths of federal lands because that action is contrary to Congress's plain intent to keep those lands available for reasonable public access and use.

## BACKGROUND AND STATEMENT OF FACTS

### I.    USDA Imposes Roadless Rule Restrictions on 58.5 Million Acres

In 2001, the Secretary of Agriculture ("Secretary") issued a rule that bluntly prohibited construction and maintenance of roads across 58.5 million acres of National Forest Service (NFS) lands. *See* Roadless Rule, 66 Fed. Reg. 3244. The Roadless Rule cut off access to and use of "two percent of America's land mass" for road-dependent projects. *Wyoming v. U.S. Dep't of Agric.*, 570 F. Supp. 2d 1309, 1326 (D. Wyo. 2008), *rev'd*, 661 F.3d 1209 (10th Cir. 2011). Within Alaska, the Roadless Rule imposed a prohibition on roads in inventoried roadless areas within the Chugach National Forest and the Tongass

*State of Alaska v. USDA*
No. 3:23-cv-00203-SLG – Lead Case
2
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 13 of 47

National Forest.[1] *See* Special Areas; Roadless Area Conservation; National Forest System Lands in Alaska, 85 Fed. Reg. 68,688 (Oct. 29, 2020) ("Withdrawal Rule") (discussing the regulatory history). As the Department would later acknowledge, this near categorical ban on road construction "fundamentally changed" its "longstanding approach to" managing national forestlands. Special Areas; State Petitions for Inventoried Roadless Area Management Rule, 70 Fed. Reg. 25,654, 25,654 (May 13, 2005) ("2005 Rule").

The Roadless Rule allowed only a few limited exceptions for road construction. *See* Roadless Rule, 66 Fed. Reg. at 3272, 36 C.F.R. § 294.12(a)-(b) (2004).[2] But there was no allowance for road access necessary for economically important and socially beneficial energy infrastructure projects.[3] For this reason, the Energy Providers have found it more difficult to develop energy infrastructure within the Chugach and Tongass regions. *See*

---

[1] The Department conducted inventories of roadless areas within the NFS system between 1967-1979. *See Wyoming*, 570 F. Supp. 2d at 1320-21 (setting out the history of inventoried roads). "In February 1999, however, the Forest Service temporarily suspended road construction activities in inventoried National Forest roadless areas while it developed a new road management policy . . . ." The Roadless Rule made these restrictions permanent. Final Rule, 88 Fed. Reg. at 5253.

[2] The current Code of Federal Regulation does not reflect Section 294.12(a) or (b). This appears to be a result of the 2005 Rule, which superseded the Roadless Rule. But the 2005 Rule was enjoined. *See California ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1021 (9th Cir. 2009). And the Roadless Rule was reinstated by the Ninth Circuit's decision in *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015).

[3] The Roadless Rule allows for road construction only as needed: (a) to ensure emergency preparedness "in cases of . . . flood, fire, or other catastrophic event[;]" (b) for required environmental remediation; (c) "pursuant to reserved or outstanding rights, or as provided by statute or treaty[;]" and (d) for the "continuation, extension, or renewal of a mineral lease." *Id*. § 294.12(b)(1)-(3), (7). Otherwise, road construction is only permitted where the "Secretary of Agriculture determines that a Federal Highway project . . . is in the *public interest* . . . [where] no other reasonable and prudent alternative exists." *Id*. § 294.12(b)(6) (emphasis added). Yet the Rule provides no criteria for determining whether a highway project serves the public interest.

Doc. 1-3, Exhibit C to Complaint, Declaration of Clay Koplin ¶ 10 (Sept. 6, 2023) ("[T]he Roadless Rule destroys the marginal feasibility of [desirable] projects because it is exponentially more expensive to construct hydroelectric projects without road access."). In particular, the Cooperative has found the Roadless Rule to be an insurmountable barrier. Mitchell Decl. ¶¶ 10-18.

### A. USDA Withdraws Roadless Rule Restrictions in the Tongass

The decision to impose Roadless Rule restrictions in the Tongass was fraught with political controversy from the outset. *See* Final Rule, 88 Fed. Reg. at 5257 (acknowledging that there has been "debate" over the Roadless Rule "for decades" and there remain "diverse opinions and views concerning whether and how road construction . . . should be restricted"). Not surprisingly, the next administration weighed competing policy concerns differently. Citing concerns that the Roadless Rule adversely affected local communities—including concerns over impacts on Alaska's energy infrastructure—the Department sought to temporarily lift Roadless Rule restrictions in 2003 to allow "communities in Southeast Alaska [to] propose road and utility connections." *See* Special Areas; Roadless Area Conservation; Applicability to the Tongass National Forest, Alaska, 68 Fed. Reg. 75,136, 75,137 (Dec. 30, 2003). But the Ninth Circuit held that this rulemaking was procedurally flawed. *See Organized Vill. of Kake*, 795 F.3d 956.

Later in 2020, the Department promulgated a new rule to withdraw the Tongass from the Roadless Rule. *See* Withdrawal Rule, 85 Fed. Reg. 68,688. In lifting Roadless Rule restrictions, the Department asserted that "[r]oadless area management . . . is fundamentally an exercise in discretion and policy judgment concerning the best use of the

*State of Alaska v. USDA*                                    4
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 15 of 47

NFS lands and resources . . . ." *Id.* at 68,691. Accordingly, the Department finalized the Withdrawal Rule because it "assign[ed] different value or weight to the various multiple uses" than it had decades earlier. *Id.*

## B. USDA Restores Full Roadless Rule Restrictions

The current Administration immediately confirmed that it had different political and policy priorities. On Inauguration Day, in 2021, the President issued an Executive Order declaring it his Administration's policy to "prioritize . . . environmental justice" over other public values. E.O. 13990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, The White House (Jan. 20, 2021).[4] The President then directed the Secretary to review the Withdrawal Rule, "in accordance with" the policy priorities set forth in his Executive Order. Fact Sheet: List of Agency Actions for Review, The White House (Jan. 20, 2021).[5]

Accordingly, the Department reimposed Roadless Restrictions on 9.37 million acres of the Tongass in January 2023—and, therein, reaffirmed Roadless Rule restrictions across 58 million acres nationally. *See* Final Rule, 88 Fed. Reg. 5252. In doing so, the Secretary acknowledged that there are "competing interests" at play; however, he asserted a prerogative to prioritize the concerns of those interest groups that voiced opposition to the Withdrawal Rule. *Id.* at 5257 (asserting broad discretion to make policy judgments in weighing competing "social, economic, cultural, and environmental" concerns); *id.* at 5255

---

[4] https://rb.gy/shmxfs.
[5] https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/.

(emphasizing that the Final Rule gave "particular" weight to "concerns of local communities, including Tribal communities" that opposed the Withdrawal Rule). The Secretary confirmed that the Final Rule was "ultimately the result of assigning different value or weight to the various multiple uses." *Id.*

## C. The Roadless Rule Inhibits Prospective Energy Projects

The Roadless Rule has proven an albatross for the Cooperative's continuing efforts to improve its energy infrastructure. The Department's inflexible prohibition on road construction has already prevented the Cooperative from completing one important project. And it continues to impede the Cooperative's "long-term energy infrastructure plans[,] [which] require road access through the Tongass." Mitchell Decl. ¶¶ 8-10, 12.

### 1. The Roadless Rule Blocks the Kake-Petersburg Intertie Project

In conjunction with another utility company, the Cooperative sought to develop a project "to connect the grids serving Kake and Petersburg on Kupreanof Island." *Id.* ¶ 15. This project, known as an "intertie project," would have provided more reliable and cost-effective utility service to the Village of Kake. But the project "remains stalled" because the U.S. Forest Service would not allow construction of necessary roads through inventoried roadless areas in the Tongass. *Id.* ¶ 18.

The Intertie Project was financially viable as originally proposed with a road connecting Kake and Petersburg through the Tongass Forest. *Id.* ¶ 17. But the Forest Service could not approve such a plan. "[B]ecause of the Roadless Rule, the [project] was approved on condition that the transmission lines would have to be constructed using helicopters to transport necessary materials and equipment." *Id.* ¶ 16.

When limited to building without roads, the Intertie Project costs "ballooned" from an original estimate of $17.5 million to "$65 million in 2010 dollars." *Id.* ¶ 17. With those excessive costs the Cooperative was unable to move forward. *Id.* But if Roadless Rule restrictions were vacated, the Cooperative "would resume [its] efforts" to complete the Kake-Petersburg Intertie. *Id.* ¶ 18.

### 2. The Roadless Rule Inhibits Other Projects

With the Final Rule reimposing Roadless Rule restrictions, the Cooperative will inevitably confront the same regulatory barrier that thwarted the Kake-Petersburg Intertie Project. With the Roadless Rule in place, the Cooperative has few options to improve its energy infrastructure; at present its most viable options would require accessing hydroelectric and geothermal resources within the Tongass—which completely envelopes the communities it serves. Mitchell Decl. ¶¶ 10-11. But cognizant of its hard experience with the Roadless Rule in the past, the Cooperative is once again "inhibit[ed]" from "pursuing its infrastructure goals" with other promising projects. *Id.* ¶ 13.

For example, "[s]tudies confirm the potential for generating geothermal electricity from [] hot springs" near Hoonah, and the Cooperative "would likely pursue such projects if it could attain road access." *Id.* ¶ 14. Likewise, the Cooperative wants to pursue other "renewable energy projects" within the Tongass. *Id.* ¶¶ 8, 10. But the Cooperative "cannot justify devoting resources to hiring consultants and engineers to draw plans, or to otherwise explore potential projects, knowing that the Roadless Rule precludes road access through the Tongass." *Id.* ¶ 13. If the Roadless Rule were vacated, the Cooperative would not only resume its efforts to complete the Kake-Petersburg Intertie, but it would begin to invest

*State of Alaska v. USDA*                                     7
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 18 of 47

resources into further developing its "near-term plans and long-term objectives to develop renewable energy projects that will reduce [its] dependence on diesel. *Id.* ¶ 10.

## II.    USDA's Claimed Statutory Authority for the Roadless Rule

The Secretary claims "broad authority" to impose Roadless Rule restrictions under the Organic Administration Act of 1897. Final Rule, 88 Fed. Reg at 5257. The "Organic Act" charges the Secretary with the responsibility of managing NFS lands.[6] 16 U.S.C. §§ 473-482. This entails the directive that NFS lands shall be managed to allow for multiple uses, while advancing the goals of "improv[ing] and protect[ing] the forests[s]," "securing favorable conditions of water flows," and "furnish[ing] a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C. § 475.

Consistent with these goals, the Organic Act authorizes the Secretary to adopt rules, as determined necessary by local conditions, to prevent the "destruction" of forestlands. 16 U.S.C. § 551. At the same time, the Act reaffirmed Congress' longstanding policy of encouraging reasonable access and use of public lands. For example, the Act guaranteed that there would be a continuing right of "egress or ingress of [] settlers" through the forests, 16 U.S.C. § 478, and that these public lands would remain open to "any person . . . for all proper and lawful purposes . . . ." *Id*.

The Secretary also claims authority to impose Roadless Rule restrictions under the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528-531 ("MUSYA"). The

---

[6] The original enactment gave this responsibility to the Secretary of Interior; however, Congress reassigned management responsibilities in 1905. *See* 16 U.S.C. § 472. *See also United States v. Grimaud*, 220 U.S. 506, 508-09 (1911).

*State of Alaska v. USDA*                                    8
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 19 of 47

MUSYA directs the Forest Service (under authority of the Secretary) to ensure that the "various renewable surface resources of the national forests . . . are utilized in the combination that . . . meet[s] the needs of the American people . . . ." 16 U.S.C. § 531(a). NFS lands must be managed "for multiple use and sustained yield." *Id*. § 529.

## STANDARD OF REVIEW

A motion for summary judgment must be granted when there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020).[7] When summary judgment is sought in an action that is based on an administrative record—such as this one—the motion serves as "the mechanism for deciding as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *W. Watersheds Project v. U.S. Forest Serv.*, No. CV-11-08128-PCT-NVW, 2012 WL 6589349, at *4 n.3 (D. Ariz. Dec. 17, 2012), *aff'd*, 603 F. App'x 612 (9th Cir. 2015) (quoting *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011)).

Under the Administrative Procedure Act, a court must hold unlawful, set aside, and vacate agency action if it is not in accordance with law, 5 U.S.C. § 706(2)(A); contrary to any constitutional right, power, privilege, or immunity, *id*. § 706(2)(B); or in excess of statutory authority, *id.* § 706(2)(C). The Energy Providers must show that the Secretary

---

[7] There is here no dispute as to any material merits-related fact. *See generally* 5 U.S.C. § 706; *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).

*State of Alaska v. USDA*                                          9
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 20 of 47

lacked authority for the Final Rule, or that the supposed statutory authority violates the Constitution. The Energy Providers are entitled to declaratory relief to clarify their rights to the extent there is a justiciable controversy. 28 U.S.C. § 2201.

## SUMMARY OF ARGUMENT

The Secretary claims an extraordinary power to impose sweeping restrictions in whatever manner he deems best for the 193 million acres of NFS lands throughout the country.[8] That approximates an area roughly twice the size of California.[9] This claim to unfettered rulemaking authority would allow him to govern with whatever law he should deem fit. But this audacious claim to uncabined rulemaking authority is untenable.

The Constitution charges Congress (not the Secretary) with "mak[ing] all needful Rules and Regulations respecting the . . . Property" of the United States. Art. IV, § 3. And while it is permissible for Congress to delegate limited rulemaking authority, the nondelegation doctrine prohibits Congress from legislating a blank check. The Constitution requires that Congress must always provide a governing intelligible principle to cabin and channel the exercise of rulemaking discretion. But in patent conflict with this separation of powers, the Secretary claims unilateral authority to cut off meaningful access to and use of vast swaths of public land; he claims power to impose Roadless Rule restrictions anywhere

---

[8] *See* By the Numbers, U.S. Department of Agriculture, Forest Service, https://www.fs.usda.gov/about-agency/newsroom/by-the-numbers.
[9] California's total land area is 155,779 square miles, or 99,698,560 acres. *See* U.S. Census Bureau, State Area Measurements and Internal Point Coordinates (2010), https://www.census.gov/geographies/reference-files/2010/geo/state-area.html ("Census Bureau Figures"). All calculations for the conversion of square miles to acres were performed through Google's conversion tool, https://rb.gy/dwadda.

*State of Alaska v. USDA*                                    10
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 21 of 47

within the United States simply because the current Administration views environmental interests to be more important than competing public values.

Integral to the American system of government is Congress' exclusive responsibility to weigh competing values in deciding what the law should be. But the Secretary arrogates that power to himself in claiming that it is within his "fundamental[] discretion" to weigh "competing interests." Final Rule, 88 Fed. Reg. at 5257. And the Secretary has exercised his supposed discretion to impose Roadless Rule restrictions on 58 million acres throughout the nation. This includes 9.37 million acres in the Tongass (an area nearly the combined size of New Jersey and Massachusetts).[10] But if the Secretary's claim of unfettered rulemaking discretion is correct, he can impose restrictions in any way he deems fit for the entirety of the 193 million acres under his control—which encompasses an area approximating the size of every state within 12 of the original 13 colonies from New England to the Carolinas.[11]

This Court can easily reject the Secretary's claimed authority under the major questions doctrine because there is no clear authority to impose sweeping Roadless Rule restrictions, and the question of whether vast swaths of federal lands should be closed to meaningful access and use is of great economic and political significance. The wealth and

---

[10] The combined land area for New Jersey and Massachusetts is 15,154 square miles, or 9,698,560 acres. *See* Census Bureau Figures, *supra*, at n.9.

[11] The combined land area between Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, West Virginia, Virginia, North Carolina, and South Carolina is 315,775 square miles, or 202,096,000 acres. *See* Census Bureau Figures, *supra* n.9. A slightly closer approximation would exclude West Virginia, for a combined land area of 291,737 square miles, or 186,711,680 acres.

strength of the nation have always been its vast natural resources. As such, throughout history Congress has pursued a policy of enabling reasonable public access to and use of public lands—with a guiding principle of balanced conservation and sustained yield. And Congress has demonstrated that it will speak clearly when, in the rare instance, it wants to cordon off public lands from reasonable economic and socially beneficial uses.

Moreover, the Secretary's claim to sweeping authority for Roadless Rule restrictions violates Congress' clear directive that NFS lands should be open to "multiple use and sustained yield." The Roadless Rule plainly conflicts with the Organic Act's explicit policy of authorizing non-destructive public access and use. And in bluntly closing off access to vast swaths of land, the Roadless Rule conflicts with MUSYA's charge that these lands should generally be open to public access and use.

## ARGUMENT

### I.   The Secretary Has No Authority to Impose Roadless Rule Restrictions

"An agency . . . 'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *See FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). The Secretary's claim of power to impose sweeping Roadless Rule restrictions on ***58 million acres across the nation*** is completely untenable as a matter of basic statutory construction. There is no way to reconcile the assertion of power to close off vast swaths of public lands with the unequivocal textual mandate that NFS lands must generally remain open for reasonable public access and use. But this Court can easily resolve this case without resorting to the canons of construction because the Supreme Court has said that Congress must provide

"clear authorization" for highly consequential and politically significant rules, *West Virginia v. EPA*, 597 U.S. 697, 732 (2022), and there is no such authority here.

### A. The Major Questions Doctrine Forecloses the Secretary's Claim to a Long Unheralded Power to Deny Nearly All Practical Public Access to and Use of Vast Swaths of National Forestlands

The Department claims that Congress authorized Roadless Rule restrictions under the Organic Act's delegation of authority, 16 U.S.C. § 551, to issue regulation concerning the "occupancy and use" of NFS lands, and "to preserve the forests thereon from destruction." *Id.* Likewise, the Department asserts that Congress delegated authority in charging the Secretary with managing NFS lands for "multiple use and sustained yield." 16 U.S.C. § 528. But the Department cannot rely on such oblique language from two long extant statutes to justify a "transformative expansion" of its authority. *Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023) (concluding that a transformative expansion of regulatory authority requires a clear statement of authority under the major questions doctrine), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

As the Department previously acknowledged, the Roadless Rule "fundamentally" departed from its historic approach to "management of inventoried roadless areas." 2005 Rule, 70 Fed. Reg. at 25,654. Historically, the Department managed NFS lands in conformance with the understanding that: "All the resources of forest reserves are for use, and this use must be brought about in a thoroughly prompt and businesslike manner, under such restrictions only as will insure the permanence of these resources." Letter from Secretary of Agriculture, James Wilson, to Gifford Pinchot, Chief Forester of the Bureau

*State of Alaska v. USDA*                                    13
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 24 of 47

of Forestry at 4 (Feb. 1, 1905) ("Wilson Letter").[12] And while the Department has long imposed rules where necessary to protect public resources against over-use, restrictions were always developed to address localized issues for each forest reserve. *Id.* at 5 (providing that "local questions will be decided upon local grounds"). By contrast, the Department now assumes sweeping authority to impose whatever rules the Secretary might deem fitting for 193 million acres of NFS lands—or any segment thereof—based exclusively on his "fundamental[] [] exercise in discretion and policy judgment." Final Rule, 88 Fed. Reg. at 5257. But this Court must reject this assertion of "extravagant rulemaking authority" under the major questions doctrine.

The major questions doctrine requires that Congress must speak clearly if it wishes to delegate rulemaking authority on issues of "vast economic and political significance." *West Virginia*, 597 U.S. at 716 (citation omitted). Accordingly, courts will not presume regulatory authority from "oblique" language when an agency asserts power to resolve a politically contentious national debate. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (requiring a clear statement of authority for an assertion of regulatory authority that would have cut-off an "'earnest and profound debate' across the country" over physician-assisted suicide) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997)); *Sackett v. EPA*, 598 U.S. 651, 677 (2023) (rejecting an interpretation of the Clean Water Act that would have "tucked an important expansion to the reach of the [Act] into convoluted language in a relatively obscure provision concerning state permitting programs."). That is

---

[12] https://foresthistory.org/wp-content/uploads/2017/02/Wilson_letter.pdf.

especially true when an agency claims authority to promulgate regulations on politically charged subjects for which Congress has a history of careful deliberation. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000) (emphasizing tobacco's "political history"). For example, the Court has said that questions over whether the United States should impose regulation to address climate change implicate the major questions doctrine.[13] *See West Virginia*, 597 U.S. at 731 (emphasizing legislative history demonstrating Congress' reticence to impose regulation to address climate change); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (rejecting an aggressively broad interpretation of nebulous language in the Clean Air Act).

A decision as to whether to cut off nearly all road-dependent access and use across 58.5 million acres is obviously a matter of "vast economic and political importance."[14] The Roadless Rule forecloses access to significant portions of the nation's material wealth by cordoning off lands greater than the combined land area of Maryland, Delaware, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, and New Hampshire.[15] And

---

[13] The Department justifies its Roadless Rule prohibitions at least in part based on its assessment that such restrictions are needed to "address[] climate change." Final Rule, 88 Fed. Reg. at 5259; *id.* at 5260 (asserting the Roadless Rule "can play a role in addressing the climate crisis"). *See also* E.O. 13990, *supra* n.4 (directing agencies to "confront the climate crisis.").

[14] The Supreme Court's use of the term "vast" signals that the major questions doctrine concerns matters that are "very great in size." Merriam Webster, https://www.merriam-webster.com/dictionary/vastness. As applied to public lands, a rule broadly cutting off access to and use of thousands of acres of land constitutes a matter of "vast economic and political concern." *E.g.*, 16 U.S.C. § 3213 (prohibiting the Executive Branch from "withdraw[ing] more than 5,000 acres without Congressional approval").

[15] These eight states have a combined land area totaling 88,765 square-miles. *See* Census Bureau Figures, *supra*, at n.9. By contrast, the 58.5 million acres subject to the Roadless Rule equate to approximately 91,400 square miles of land.

if the Secretary's claim to "broad discretion" over all NFS lands were accepted, it would mean that the Department could cordon off still greater swaths of land (more than three times more) based on nothing more than one man's assessment as to how to weigh competing public values.

Congress would have spoken clearly if it intended to authorize Roadless Rule restrictions because the Constitution explicitly charges "Congress" with "mak[ing] all needful Rules and Regulations respecting the . . . Property" of the United States. *See* Art. IV, § 3. *See also Nebraska v. Biden*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) (explaining the major questions doctrine as a matter of contextual construction and that "[b]ackground legal conventions . . . are part of the statute's context"). For that matter, Congress has exercised its authority from the beginning of the Republic to encourage reasonable public access to and use of our nation's many natural resources. *See Central Pac. Ry. Co. v. Alameda Cnty.*, 284 U.S. 463, 472-73 (1932) (explaining that Congress enacted R.S. 2477 to encourage roads as "necessary aids to the development and disposition of the public lands"); *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 96 (2014) (recounting that "[t]he young country had numerous reasons to encourage settlement and development of this vast new expanse[,]" and that to facilitate access through federal lands "Congress began granting to railroad companies rights of way through the public domain"). After all, Congress has always understood the vital importance of those resources for the prosperity and strength of the nation. *Cf.* 30 U.S.C. § 21a ("The Congress declares [] it is the continuing policy of the Federal Government in the national interest to foster and encourage private enterprise in [] the development of

economically sound and stable domestic mining . . . to help assure satisfaction of industrial, security and environmental needs . . . ."); 30 U.S.C. § 22 ("Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase . . . .").

Meaningful access through federal lands has always been important in the development of commerce and settlement in the American West, just as it promises to be important for continued development in Alaska. *See* Wilson Letter at 4 (recognizing "[t]he vital importance of forest reserves to the great industries of the Western States"). As such, it is no surprise that Congress has always spoken clearly when cordoning off public lands from productive use. For example, the Wilderness Act expressly designated certain lands as "wilderness areas" and prohibited the Executive Branch from designating other lands as "wilderness areas" except with congressional approval. 16 U.S.C. §§ 1131-1136. Likewise, Congress spoke clearly when it wanted to authorize the President to designate national monuments—with special restrictions on access and use—under the Antiquities Act. 54 U.S.C. § 320301. Separately, Congress has enacted legislation explicitly designating certain areas as national monuments in Alaska, while leaving others open for "multiple-use." *Compare* Pub. Law No. 96-487, § 501(b) (Dec. 2, 1980) (generally allowing for "multiple-use"), *with* § 503 (creating national monuments within portions of the Tongass).

What is more, Congress has expressly confirmed the national significance and economic importance of maintaining a balanced approach to land management in Alaska. The Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3101, pronounced that Congress had established the proper "balance" between competing public values at issue

*State of Alaska v. USDA*                                    17
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 28 of 47

in managing federal lands. Congress made clear that it generally wanted to enable reasonable use of these public lands—including for the development of "Alaska's transportation and utility network." 16 U.S.C. § 3161. *See also* 16 U.S.C. §§ 3164, 3167 (expressly contemplating the need for facilitating future road construction within undeveloped federal lands); 16 U.S.C. § 3213 (discouraging the Executive Branch from considering new conservation areas). Likewise, Congress enacted the Tongass Timber Reform Act "to provide a [continuous] supply of timber from the Tongass." 16 U.S.C. § 539d(a).

In all of this, Congress has demonstrated sensitivity to competing political interests from across the nation over whether and to what extent federal lands should be open to or cordoned off from public use. Yet the Secretary has arrogated authority to himself to cut off ongoing political dialogue in asserting power to impose Roadless Rule restrictions based on his unilateral judgement as to how to weigh competing public values. As a result, the competing political factions have now shifted their policy debates from Congress to the Executive Branch. *See* Final Rule, 88 Fed. Reg. at 5257 (acknowledging continuing debate over the Roadless Rule). And, consequently, the Department has now oscillated in its position on Roadless Rule restrictions for the Tongass over five successive presidential administrations—each asserting its own political priorities without regard to the will of the People's elected representatives in Congress.

Just as the Supreme Court held that EPA cannot transform its authority to regulate air emissions from stationary sources into a power to "restructure the American energy market," the major questions doctrine forecloses the Department from transforming its

*State of Alaska v. USDA*                                    18
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 29 of 47

charge to take a balanced approach to conservation into an authority to impose sweeping restrictions on access to and use of vast swaths of land. *West Virginia*, 597 U.S. at 724. Far from the "clear authorization" required by the major questions doctrine, *id.* at 732, the Organic Act and the MUSYA unequivocally prohibit the Roadless Rule restrictions.

## B.    The Organic Act and MUSYA Clearly Prohibit the Roadless Rule

The Secretary's claimed authority also fails under a straightforward textual analysis. The text of both the Organic Act and MUYSA guarantee that NFS lands will remain open for reasonable access and use—while, at the same time, requiring reasonable conservation of natural resources. But Roadless Rule restrictions bluntly deny all road-dependent access to and use of vast swaths of national forestlands in obvious conflict with the plain text.

The Department has a "duty . . . to follow [the textual] commands as written, not to supplant those commands with others it may prefer." *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). Likewise, this Court must enforce the plain meaning of the text. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984) ("the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").[16] Accordingly, the Secretary's policy preference for "roadless rule values" is wholly irrelevant. *See Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) ("An agency literally has no power to act . . . unless and until Congress confers power upon it.").

---

[16] The Supreme Court recently granted certiorari to consider the question of "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency." *Loper Bright Enterprises v. Raimondo*, 143 S. Ct. 2429 (2023) (No. 22-451).

## 1. The Organic Act Does Not Authorize Sweeping Roadless Rule Restrictions Over Vast Swaths of National Forestlands

### a. The Text Unambiguously Forecloses the Roadless Rule

The Secretary claims that Congress authorized Roadless Rule restrictions because the Organic Act provides that "he may make [] rules and regulations" concerning the "occupancy and use" of national forestlands, and "to preserve the forests thereon from destruction." 16 U.S.C. § 551. But the authority for rules to protect forestlands from "destruction" is limited to rules targeted at conduct that threatens to lay waste to public resources. *E.g.*, *United States v. Weiss*, 642 F.2d 296, 298 (9th Cir. 1981) (allowing "reasonable rules" concerning mines). It is not authority for a near categorical prohibition on roads—and all public access and use dependent on roads—across vast swaths of land.

Congress contemplated that the Secretary would promulgate rules to prevent "destruction by fire" and similar "depredations upon the public forests[.]" *Id*. 297-98 & n.2. But the development of a road for reasonable public access to and use of forestlands is in no way analogous to a destructive fire. A carefully engineered road that is designed to minimize environmental harms can hardly be viewed as a "depredation" on the land. And while, of course, the Secretary has authority to impose reasonable restrictions to minimize environmental impacts, that authority cannot go so far as to categorically prohibit road construction across millions of acres.

As "used in old English law[,]" the term "destruction" concerns the laying of "waste" to the land or woods. Black's Law Dictionary (4th ed. 1968). *See Diaz-Rodriguez v. Garland*, 55 F.4th 697, 712 (9th Cir. 2022) ("[T]extual analysis typically begins by

consulting contemporaneous dictionaries, because we are 'bound to assume that the legislative purpose is expressed by the ordinary meaning of the words used.'") (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)).[17] This comports with the definition of "depredation," which concerns the act of "lay[ing] waste; plunder[ing]; ravag[ing]."[18] Thus, in common usage one might refer to the destruction or depredation caused by the ravages of war—which may lay waste to an entire landscape. *E.g.*, *Ross v. United States*, 29 Ct. Cl. 176, 178 (1894) ("[t]he depredations were the ravages of war"). By contrast, a road designed to minimize environmental impacts does not ravage or destroy entire landscapes or ecosystems. *Cf.* Black's Law Dictionary (4th ed.) (defining "destroy" to mean "an act which renders the subject useless for its intended purpose").

What is more, other provisions of the Act confirm that NFS lands shall remain open to corridors of travel. For example, the Act guaranteed that settlers would be allowed to continue to "egress and ingress" through the national forests. 16 U.S.C. § 478. Likewise, the Act authorized reasonable access to and use of national forestlands in establishing a policy of "furnish[ing] a continuous supply of timber for the use[s] and necessities of [the] citizens of the United States." 16 U.S.C. § 475. And more generally, the Act ensured that these lands would remain open to "any person . . . for all proper and lawful purposes . . . ."

---

[17] *See also Lagandaon v. Ashcroft*, 383 F.3d 983, 988 (9th Cir. 2004) ("Dictionaries can aid in applying step one of the *Chevron* analysis.") (citing *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 225-28 (1994)).

[18] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/depredate#:~:text=%3A%20to%20lay%20waste%20%3A%20plunder%2C,%CB%8Cde%2Dpr%C9%99%2D%CB%88d%C4%81%2Dsh%C9%99n.

16 U.S.C. § 478. As such, the authority to prohibit "destruction" cannot be stretched so elastically as to allow for rules that would categorically foreclose roads and trails.

> **b.    The Secretary's Interpretation Unreasonably Transforms the Authority to Prohibit "Destruction" of Forestlands into an Ungoverned and Limitless Power**

Even if the text were ambiguous, it would be patently unreasonable to construe the Act as allowing rules totally foreclosing all reasonable access to and use of vast swaths of public forestlands. The term "destruction" cannot reasonably be construed as authority to entirely prohibit road construction without regard to whether contemplated roads may be engineered to minimize and mitigate environmental harms. *See Yith v. Nielsen*, 881 F.3d 1155, 1165-66 (9th Cir. 2018) (emphasizing that statutory text should "be interpreted as taking their ordinary, contemporary, common meaning") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). For one, if road construction could categorically be deemed "destruction" then the Department would be duty-bound to prohibit roads throughout the entirety of the national forest system. Such an interpretation would plainly frustrate Congress' policy of balancing conservation and other important public values. *See The Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003) (stressing the "fundamental canon that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (quoting *Williamson Tobacco*, 529 U.S. at 133).

Nor is it reasonable to construe the Organic Act as delegating totally unfettered discretion. The Supreme Court has already confirmed that the Act should not be construed as delegating Congress' lawmaking powers. *Grimaud*, 220 U.S. at 516 (affirming that

Congress had set upon a definite policy and had merely "authoriz[ed] he Secretary . . . to meet [] local conditions"). This means that there must be a standard that limits and controls the Secretary's discretion—*i.e.*, an "intelligible principle." *See Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472-73 (2001) (affirming that to be constitutional, a delegation of rulemaking authority must be governed by a textually grounded "intelligible principle").

Specifically, the Secretary is limited to enforcing rules as may be necessary considering the "peculiar and special features" of each forest. 220 U.S. at 516. As such, the Act requires findings of fact to justify any given restriction aimed at avoiding "destruction" of forestlands. *Id*. This is why the Department had long developed rules through the Forest Service in individualized assessments of what uses would be compatible with local conditions. *See* 2005 Rule, 70 Fed. Reg. at 25,654 (observing that the Roadless Rule represented a marked departure from the Department's historic approach).

By contrast, the Roadless Rule imposed sweeping restrictions on all public access and use dependent on roads across 54 million acres—without making specific findings of facts as to whether such restrictions were needed to "meet [] local conditions." *Grimaud*, 220 U.S. at 516. Likewise, the Final Rule merely reassessed competing public policy considerations without explaining why a prohibition across 9.37 million acres was needed to prevent the "destruction" of the Tongass.[19] *See* Final Rule, 88 Fed. Reg. at 5254-55 (emphasizing that "this rulemaking is based on a reevaluation of the social value of the

---

[19] "The USDA's assessment is that the best mechanism to account for these many and competing interests is to return the regulatory landscape back to the 2001 Roadless Rule." Final Rule, 88 Fed. Reg. at 5257.

various uses of the Tongass, rather than on new factual findings"). The Final Rule merely explained that the Secretary was reinstating the Roadless Rule because he "believes that this alternative strikes the appropriate balances among the various values . . . ." *Id*. at 5255.

But if the Secretary's interpretation were accepted it would deny any intelligible principle to limit and channel his rulemaking discretion. This Court must reject that interpretation because it would raise serious constitutional issues under the nondelegation doctrine. *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) (providing that courts should avoid "serious [constitutional] doubt.").

> ## 2.  The Multiple Use Sustained Yield Act Does Not Authorize Roadless Restrictions Bluntly Denying Practical Use and Access

> ### a.  The Multiple Use and Sustained Yield Mandate Likewise Forecloses the Roadless Rule

The Roadless Rule's near categorical prohibition on all road-dependent access and use across 54 million acres likewise conflicts with the MUSYA. 16 U.S.C. §§ 528-531. With its enactment in 1960, Congress reaffirmed its longstanding policy of balanced conservation. The Department is charged with "administer[ing] the renewable surface resources of the national forests for multiple use and sustained yield," including for the purposes of "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." *Id.* §§ 528-529.

On its face, this text requires that the national forests should remain open for a multitude of uses—subject to the qualification that permissible uses be limited to those that ensure "sustained yield" of "renewable surface resources." "Sustained yield" "means

[needed for] the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b). This necessarily forecloses sweeping rules that bluntly deny road construction and road-dependent projects across vast lands because such rules inhibit the explicit goal of enabling "annual or regular [] output" of renewable resources. *Id*.

b. **Any Interpretation Conferring Unchecked Authority to Preclude Reasonable Access and Use Is Unreasonable**

The MUYSA delegates significant discretion for the Secretary to decide what specific uses will be allowed or prohibited within the national forest system. *See Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (affirming the Secretary's broad discretion for rules concerning grazing). But the statute does not allow the Secretary to impose any rule he might deem fitting. His discretion is limited by Congress' overriding mandate that public forestlands should remain open for public use in the manner "that will best meet the needs of the American people . . . ." 16 U.S.C. § 531(a). Accordingly, it would be unreasonable to construe the MUSYA as authorizing sweeping authority to close off vast swaths of land.

The Act provides that the Department must make "judicious" decisions about the best use of natural resources and recognizes that "some land will be used for less than all of the resources." *Id*. Further, the text provides that "multiple use" means: "harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative

*State of Alaska v. USDA*                                    25
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 36 of 47

values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output." *Id*.

Even if the text is ambiguous as to when exactly the Secretary may impose restrictions on access and use in any specific area, it would be unreasonable to presume that Congress intended to allow sweeping Roadless Rule restrictions across millions of acres without any accommodation to allow for beneficial uses. For example, the hydroelectric and geothermal projects that the Cooperative wishes to pursue would serve a pressing public need for more affordable energy. They would require road access to be economically feasible; however, those roads could be engineered to minimize the impact on "renewable surface resources."

What is more, it would be unreasonable to construe the MUYSA as delegating a blank check of authority for the Secretary to impose whatever restrictions he may deem appropriate because a delegation of unfettered rulemaking authority would violate the nondelegation doctrine. This Court must prefer a reasonable limiting construction to avoid constitutional doubt where "possible." *See Crowell*, 285 U.S. at 62. For example, in *Solid Waste Agency of Northern Cook County*, the Supreme Court rejected an expansive interpretation of the Clean Water Act's jurisdictional provision because it would have pressed the bounds of federalism. *See Solid Waste Agency of Northern Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). As such, it is only reasonable to construe the MUSYA as foreclosing sweeping Roadless Rule restrictions.

## II.    No Intelligible Principle Governs the Secretary's Rulemaking Authority

### A.    The Nondelegation Doctrine Requires Congress Must Provide a Standard to Limit and Channel the Exercise of Discretion

The Constitution vests Congress with the exclusive power to make law because only Congress is directly accountable to the American People. U.S. Const. art. I, § 1. Thus, the Constitution forbids Congress from delegating its lawmaking powers. *See Whitman*, 531 U.S. at 472 (affirming the Vesting Clause prohibits any "delegation of [legislative] powers"). In this way, separation of powers ensures "democratic accountability." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 124 (2022) (Gorsuch, J., concurring).

Separation of powers demands that regulation promulgated by the Executive Branch must be governed by an objective standard—*i.e.*, law established by Congress. *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394 (1928) (the Executive Branch must "conform" to law). Otherwise, "unaccountable 'ministers'" assume the role of lawmaker. *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring). And that would frustrate our "constitutional design." *Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (Congress cannot "announce vague aspirations and then assign others the responsibility of adopting legislation to realize its goals").

For this reason, the nondelegation doctrine requires that Congress must provide an "intelligible principle" to *cabin* and *guide* the exercise of administrative discretion. *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935) ("As to the transportation of [hot oil] . . . Congress ha[d] declared no policy, [] established no standard, [] laid down no

*State of Alaska v. USDA*                                    27
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 38 of 47

rule."). Of course, Congress can authorize executive officers and agencies to determine facts and can delegate "the duty to carry out [a] declared policy." *Id.* at 426. But Congress cannot "[leave] the matter to the [executive] without standard or rule, to be dealt with as he please[s]." *Id.* at 418. *See also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825) (emphasizing that Congress must decide the "important subjects").

Applying this constitutional standard, the Supreme Court famously ruled unconstitutional a provision of the National Industrial Recovery Act, in *Panama Refining*, because the provision delegated authority to outlaw the transportation of hot oil without providing a "definition of circumstances and conditions in which the transportation is to be allowed or prohibited."[20] 293 U.S. at 430. Section 9(c) violated the nondelegation doctrine because nothing in the text governed President Roosevelt's exercise of discretion. The President was left free to weigh competing policy considerations as he deemed "fit."[21] *Id.* at 415.

Later that same year, the Supreme Court declared the entire NIRA unlawful because the Act delegated "unfettered discretion" for the President to issue "industry codes" with whatever restrictions he thought "needed or advisable." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537-38 (1935). The Court acknowledged that the President's

---

[20] Historically, the judiciary narrowly construed delegations of rulemaking authority to avoid unlawful delegations of Congress' lawmaking powers. *See, e.g.*, *United States v. United Verde Copper Co.*, 196 U.S. 207, 215 (1905) (rejecting an interpretation that would enable a federal officer to "define" critical text).

[21] The weighing of "competing [public] values" is "the very essence of legislative choice . . . ." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). *See also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 382 (2023) (emphasizing that it is the role of lawmakers to weigh "incommensurable" values).

delegated powers were not without limit. *Id.* For example, the NIRA prohibited the President from approving industry codes that would encourage monopolies or that would unduly suppress small business. *Id.* at 522-23. Even so, the NIRA violated the separation of powers because nothing in its text channeled the President's discretion in deciding what specific rules should govern the conditions of lawful employment or anything else. *Id.* at 538 (the NIRA's restrictions left "virtually untouched … that wide field of legislative possibilities").

Critically, in *Panama Refining* and *Schechter* the Supreme Court rejected the Solicitor General's argument that an intelligible principle could be inferred from the statute's general statement of policy. Instead, the Court affirmed that an intelligible principle must be rooted in statutory text—rather than self-serving claims about the general purposes of the statute. *Panama Refining*, 293 U.S. at 417-18; *Schechter*, 295 U.S. at 541-42. As such, the NIRA's hortatory goal of improving American economic conditions was insufficient.

**B.** **Congress Violated the Nondelegation Doctrine in Delegating Unfettered Rulemaking Authority to the Secretary**

**1.** **There Is No Intelligible Principle Under the Secretary's Interpretation of the Organic Act**

The Organic Act cannot be construed as authorizing sweeping Roadless Rule restrictions consistent with the Supreme Court's decision in *Grimaud*. That case concerned sheepherders who were prosecuted for violating regulations requiring a license to graze livestock within national forestlands. 220 U.S. at 514. The sheepherders argued that the Act was unconstitutional because it imposed criminal penalties for violation of regulations

that had not yet been promulgated. *Id.* But the Supreme Court rebuffed that argument—holding that it is generally permissible for Congress to impose criminal penalties for violation of regulations promulgated under a statute delegating rulemaking authority. *Id.* at 519. In reaching this conclusion the Court emphasized the distinction between a statute that impermissibly leaves discretion to the Executive Branch to decide when criminal liabilities should attach, and a statute like the Organic Act—wherein Congress made the critical decision that violations should be punishable as criminal offenses. *Id.* (distinguishing *United States v. Eaton*, 144 U.S. 677 (1892)). But in all of that, *Grimaud* assumed that the Secretary's rulemaking discretion was limited.

The opinion emphasized that when promulgating rules governing access to and use of forest reserves, the Secretary was engaged in a fact-finding mission. *Id.* at 515-17. As such, the Court presumed that it was permissible for the Secretary to promulgate reasonable rules regulating grazing. But it would have been an entirely different case had the Secretary asserted unfettered discretion to impose a categorical prohibition on grazing throughout vast swaths of land based simply on his personal judgment that "anti-grazing values" should be deemed more important than the public's interest in making reasonable use of forest reserves. *See Grimaud*, 220 U.S. at 522 ("The Secretary of Agriculture could not make rules and regulations for any and every purpose.").

Far from the limited understanding of the Secretary's rulemaking powers contemplated in *Grimaud*, the Secretary now claims authority to issue rules imposing a near categorical prohibition on roads through 58 million acres of land—including 9.37 million in the Tongass—based on nothing more than his judgment as to how to weigh

*State of Alaska v. USDA*                                      30
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 41 of 47

competing public values. Final Rule, 88 Fed. Reg. at 5257. As argued above, this claimed discretion does not comport with the ordinary meaning of the statutory text. But if the Secretary's authority to promulgate rules "to preserve the forests [] from destruction" is understood so elastically as to allow the Department to prohibit any activity that might have any conceivable environmental impact, the Act violates the intelligible principle test.

If the authority to prohibit the "destruction" of NFS lands entails power to categorically prohibit roads regardless of whether they may be constructed to minimize environmental impacts, then the Secretary wields unchecked discretion to decide what level of environmental harm is tolerable or intolerable. After all, if the term "destruction" is understood as implicating every human activity that might cause any level of environmental impact, the Secretary is free to make any policy judgement he pleases. At that point he can weigh competing social, economic, and environmental values as he likes because he has unfettered discretion to allow or prohibit any conceivable use of NFS lands. *See Int'l Union v. OSHA*, 37 F.3d 665, 669 (D.C. Cir. 1994) (stating that it would violate the nondelegation doctrine to give an agency discretion to impose rules that may bring entire industries to the brink of destruction, or to impose no regulation at all).

And for the same reason, there is a nondelegation violation if the power to "make [] rules and regulations" concerning the "occupancy and use" of NFS lands is understood as a blank check to impose any rules that the Secretary may deem fit. *See United States v. Pheasant*, No. 3:21-CR-00024, 2023 WL 3095959, at *7 (D. Nev. Apr. 26, 2023) (a delegation of open-ended authority for the Bureau of Land Management to impose rules on public lands violates the nondelegation doctrine). So construed, the Secretary could

issue any code of rules—backed by threat of criminal sanction. But *Schechter* holds that courts must strike down delegations of plenary rulemaking authority. 295 U.S. at 537-38.

## 2. The Charge to Manage Lands for "Multiple Use and Sustained Yield" Is Not an Intelligible Principle

The federal courts have repeatedly construed the MUSYA as delegating broad rulemaking discretion. The Ninth Circuit has gone so far as to suggest that the Secretary operates without any direction in regulating federal lands because the statutory text "breathe[s] discretion at every pore." *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975). *See also Perkins*, 608 F.2d at 806-07 (concluding that MUSYA imposes no "concrete limits upon agency discretion"). Yet the Secretary's discretion cannot be so broad as to allow him a free hand to weigh competing public values in whatever manner he might like in deciding whether to impose sweeping restrictions.[22]

The MUSYA violates the nondelegation doctrine if the text is truly devoid of any governing standard. Under the Secretary's interpretation, there is nothing cabining or channeling the exercise of discretion. The Secretary simply asserts that he is free to impose any restrictions on access or use that he may deem fitting—based on his own policy judgments. So construed, the MUSYA violates the intelligible principle test, just as the NIRA unconstitutionally delegated power to President Roosevelt to craft any code of regulation he deemed appropriate in *Schechter*. *See Pheasant*, 2023 WL 3095959, at *8

---

[22] By its plain text, the MUSYA denies the Secretary the power to impose sweeping Roadless Rule restrictions. *See supra* at Section I(B)(2). *See Crowell*, 285 U.S. at 62 (holding that text should reasonably be construed to avoid constitutional issues).

(finding a nondelegation violation because there is "no language in the statute that cabins the authority of the Secretary of the Interior").

And it is no answer for the Secretary to say that the statute contemplated that "some land will be used for less than all of the resources." 16 U.S.C. § 531(a). After all, nothing in the text provides direction as to when and to what extent any given area should be preserved in a natural state. While the statute directs the agency to pursue "harmonious and coordinated management of [] various resources . . . without impairment of the productivity of the land," it provides no concrete direction as to whether any given activity or development should be allowed other than in directing that the Secretary must give due "consideration . . . to the relative values of the various resources" in particular areas. 16 U.S.C. § 531(a). What is "due consideration" is left entirely to the Secretary's discretion.

For that matter, the MUSYA provides no textual standard for prioritizing either environmental or competing economic or social values when deciding whether to impose restrictions. For example, the text provides that the agency should "not necessarily" prefer "the combination of uses that will give the greatest dollar return or the greatest output." 16 U.S.C. § 531(a). This leaves the Secretary free to prioritize economic concerns if he likes, or not—based entirely on his personal judgment. *But see Panama Refining*, 293 U.S. at 416-19 (rejecting the notion that there was an intelligible principle in the implicit expectation that the President would act prudently in public interest).

Nor does the text provide any substantive direction to channel the exercise of discretion in charging the Secretary to "mak[e] the most judicious use of the land . . . ." 16 U.S.C. § 531(a). Once again, the Secretary is left with an open-ended choice between

*State of Alaska v. USDA*                    33
No. 3:23-cv-00203-SLG – Lead Case
Case 3:23-cv-00203-SLG   Document 38   Filed 04/02/24   Page 44 of 47

prohibiting any activity that may leave even the faintest trace of human presence and allowing any range of activities—including activities that may significantly change the landscape and ecology of the forest. *See Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1235 (10th Cir. 2011) (stressing the breadth of agency discretion). Such unfettered discretion is the hallmark of a nondelegation violation. *See Int'l Union v. OSHA*, 938 F.2d 1310, 1318 (D.C. Cir. 1991) (cautioning that the Occupational Safety and Health Act would be unconstitutional if it gave the agency unfettered power to decide whether to regulate to the limits of technical feasibility or instead to take costs into account).

## III.    The Energy Providers Have Article III Standing

A plaintiff has standing if it suffers a "concrete and particularized injury" that is caused by the defendant's actions, and which will likely be "redressed by a favorable decision." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). The Energy Providers have standing to bring this case because the Cooperative has suffered a concrete and particularized injury that is traceable to the Secretary's enforcement of Roadless Rule restrictions in the Tongass. Specifically, the Final Rule injures the Cooperative because—in reimposing Roadless Rule restrictions—the Rule creates an insurmountable obstacle for both the Cooperative's "near-term plans" and "long-term plans" for improving its energy infrastructure. Mitchell Decl. ¶¶ 10, 12-13. This Court can redress this injury with an order to vacate the Final Rule—which would permit the Cooperative to pursue its plans, free from the strictures, costs, and burdens, imposed by the Roadless Rule. *See* 5 U.S.C. § 706(2) (authorizing courts to "hold unlawful and set aside agency action").

Likewise, the Association has standing to pursue this claim on behalf of its membership, which includes the Cooperative. *See* Doc. 1-2, Exhibit B to Complaint, Declaration of Crystal Enkvist ¶ 7 (Sept. 5, 2023). *See also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000) (affirming associations have standing to represent injured members). And where any one plaintiff has standing, standing is satisfied as to all the parties. *See Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief . . . .").

## CONCLUSION

For the forgoing reasons, this Court should grant the Cooperative's motion for summary judgment.

DATED: April 2, 2024.

<div style="margin-left: 40%">

Respectfully submitted,

LUKE A. WAKE*
DAMIEN M. SCHIFF*
JEFFREY W. McCOY*
CHARLES T. YATES*

By____/s/ Luke A Wake_____
    LUKE A. WAKE, *Pro Hac Vice*
    Cal. Bar No. 264647

*Pro Hac Vice*

*Attorneys for Plaintiffs*
*Inside Passage Electric Cooperative*
*and Alaska Power Association*

</div>

## CERTIFICATE OF SERVICE

I certify that on April 2, 2024, I filed the foregoing using the Court's ECF system, which will provide service to all counsel of record.

<div align="right">

_____ /s/ Luke A Wake _____

LUKE A. WAKE, *Pro Hac Vice*
Cal. Bar No. 264647

*Pro Hac Vice*

*Attorney for Plaintiffs*
*Inside Passage Electric Cooperative*
*and Alaska Power Association*

</div>